**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SONIA HERNANDEZ,**

                                    **Plaintiff,**

                  **v.**                                              **1:20-CV-42**
                                                              **(FJS/CFH)**
**KWIAT EYE AND LASER SURGERY, PLLC;**
**and DAVID M. KWIAT, M.D.,**


                                    **Defendants.**
_____

**APPEARANCES**                              **OF COUNSEL**

**SANDERS & SANDERS**                        **HARVEY P. SANDERS, ESQ.**
401 Maryvale Drive
Cheektowaga, New York 14225
Attorneys for Plaintiff

**GIRVIN & FERLAZZO, P.C.**                  **SCOTT P. QUESNEL, ESQ.**
20 Corporate Woods Boulevard
Albany, New York 12211
Attorneys for Defendants


**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. BACKGROUND

On December 3, 2015, Sonia Hernandez, D.O. ("Plaintiff") received a Final Order from

the Texas State Office of Administrative Hearings determining that she was ineligible for a

Texas Medical License.  _See_ Dkt. No. 53-1, Defs' Stmt. of Material Facts, at ¶ 21.[1]  According

---
[1] The factual information in this section comes from Defendants' Statement of Material Facts
attached to their motion for summary judgment and is undisputed unless otherwise noted.

to that Final Order, between October and November of 2011, Plaintiff performed six surgeries at a hospital in South Dakota; three of those surgeries resulted in complications, and two of those cases were considered to be serious.  *See id.* at ¶¶ 22-23.  Plaintiff's employer in South Dakota allegedly suspended her surgical privileges and terminated her employment in January 2012, and the Texas Medical Board concluded in 2015 that Plaintiff, who had "not performed surgery since 2011 . . . need[ed] additional training before she [could] safely operate again." *See id.* at ¶¶ 24, 27.

Less than one month after receiving that Final Order, Plaintiff signed an employment agreement (the "Agreement") with Defendant Kwiat Eye and Laser Surgery, PLLC ("Defendant Kwiat Eye"), located in Amsterdam, New York, and began working for Defendant Kwiat Eye in March 2016.  *See id.* at ¶¶ 1, 20, 29.  Defendant Kwiat Eye consists of a medical office and the Mohawk Valley Eye Surgery Center, where physicians perform various types of surgeries including LASIK, cataracts, advanced lenses, and plastic surgery for the eyes.  *See id.* at ¶¶ 2-3. In addition to providing medical services to private patients who pay out-of-pocket, Defendant Kwiat Eye receives patient referrals from several large health insurance companies and Medicare and Medicaid providers, including the Capital District Physicians' Health Plan ("CDPHP"), Excellus BlueCross BlueShield ("Excellus"), Fidelis Care Health Insurance ("Fidelis"), and MVP Health Care ("MVP").  *See id.* at ¶ 9.  Defendants allegedly expected that Plaintiff would become a participating provider for each of these insurance companies; and, as part of the Agreement, Plaintiff agreed to become a participating provider for patients with Medicare and Medicaid.  *See* Dkt. No. 53-16, Dr. Kwiat Aff., at ¶¶ 5, 14; Dkt. No. 53-17, Agreement, at § 1.2.

In April 2017, the Mohawk Valley Medical Associates, which performs accreditation functions for MVP, notified Defendant Kwiat Eye that its membership committee had reviewed Plaintiff's application to become a participating medical provider for MVP and had denied Plaintiff's application. *See* Dkt. No. 53-1 at ¶¶ 30-31. In that letter, the membership committee referenced the fact that Plaintiff represented in her application that she had not been denied a medical license when, in fact, the State of Texas had denied her a medical license. *See id.* at ¶ 32. MVP subsequently approved Plaintiff after Defendant David M. Kwiat, M.D. ("Dr. Kwiat"), a New York State licensed and board-certified ophthalmologist, agreed to admit MVP's patients for Plaintiff, which made him responsible for Plaintiff's work. *See id.* at ¶¶ 4, 33.

In September 2017, Excellus's Medical Director and Credentialing Committee advised Defendant Kwiat Eye that it was seeking additional information from Plaintiff in connection with her application to become a participating provider, including information concerning the denial of her medical license in Texas and her termination in South Dakota. *See id.* at ¶¶ 34-35. Ultimately, in October 2017, Excellus notified Defendant Kwiat Eye that, after reviewing Plaintiff's application, it would not process her request for participation in its program. *See id.* at ¶ 37. Similarly, on September 26, 2017, Fidelis's Credentials Committee notified Defendant Kwiat Eye that it had reviewed Plaintiff's application to be appointed as a participating provider and had found that Plaintiff did not meet the criteria for participation in Fidelis's network. *See id.* at ¶ 36. In January 2018, in response to Plaintiff's inquiry, Fidelis once again advised Plaintiff that she did not meet the criteria for participation in its network. *See id.* at ¶ 38.

In addition to these issues, Plaintiff "regularly had disputes and disagreements" with Defendant Kwiat Eye's technicians. *See id.* at ¶ 39. Beginning in September 2017 through

early April 2018, Plaintiff sent weekly memos, which were copied to Dr. Kwiat, in which she detailed what she perceived to be incidents of disrespect, and errors and omissions that the technicians had committed. *See id.* at ¶ 40. Plaintiff met with Dr. Kwiat on March 28, 2018, to discuss hiring a new technician, but Dr. Kwiat stated that Defendant Kwiat Eye had enough technicians to service its patients' needs, Plaintiff only sought to hire a new technician due to her ongoing disputes with the other technicians, and if Plaintiff wanted to hire a new technician she would have to pay for that technician herself. *See id.* at ¶¶ 42-45.

By mid-April 2018, Plaintiff continued to have disputes and disagreements with the technicians and neither Excellus nor Fidelis had credentialed her. *See id.* at ¶¶ 47-48. On April 13, 2018, Dr. Kwiat signed a letter terminating Plaintiff's employment with Defendant Kwiat Eye and specifying that Plaintiff breached the Agreement, and emailed that termination letter to Plaintiff. *See id.* at ¶¶ 52-55. After her termination, Plaintiff asked Defendant Kwiat Eye to return her personal belongings to her, which it ultimately did off-premises. *See id.* at ¶¶ 56-57. She also asked Dr. Kwiat to complete and sign a document identified as "Form L," a form that included a physician licensure evaluation, verification of postgraduate training, and a professional evaluation for the Texas Medical Board. *See id.* at ¶ 58. Dr. Kwiat told Plaintiff that he was willing to provide her with a complete and signed copy of the Form L if Plaintiff was willing to execute a release, but she refused. *See id.* at ¶¶ 59-60.

On May 29, 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See id.* at ¶ 62. In that charge, Plaintiff asserted that she was subject to unfair treatment. See Dkt. No. 12-1, Ex. 1, EEOC Compl., at 2. Plaintiff alleged that she complained about the technicians' errors, and Dr. Kwiat told her that if she had complained anywhere else she would have been gone. *See id.* She also alleged that, from

- 4 -

October 2017 to October 2018, she sent several memos to Supervising Technician Kim Morey and Clinical Director Mikala Foster, copying Dr. Kwiat on them, and the technicians "became hostile to [her] in front of the patients and their families." *See id.*  Plaintiff explained that, after Dr. Kwiat gave her permission to hire a technician, he told her that she would have to pay that technician out of her own pocket. *See id.* at 3.  Plaintiff asserted that the technician she intended to hire was Hispanic, and that was not the procedure that had been followed in the past, since Defendant Kwiat Eye paid the other technicians. *See id.*

In her EEOC charge, Plaintiff acknowledged that she was terminated for her "inability to become credentialized" in April 2013; however, upon her belief, "white female Dr. Siahpoosha also [was] not credentialized, yet she continue[d] to work" at Defendant Kwiat Eye. *See id.* Plaintiff believed that Dr. Kwiat terminated her for having complained about the technicians. *See id.*  Plaintiff also alleged that Defendant Kwiat Eye required her to sign a release agreement; and, if she did not sign the release, it would not send the Texas Medical Board the required paperwork that she needed. *See id.*  Plaintiff asserted that she believed that Dr. Kwiat's refusal to submit the Form L to the Texas Medical Board was a form of retaliation against her for her complaints. *See id.*  Plaintiff also alleged in that charge that, since being terminated, potential employers informed her that Dr. Kwiat did not respond to employment verification requests and did not return calls. *See id.*  Plaintiff believed that the reasons stated for her termination were pretext and that she was discriminated against because of her national origin and race, which is Hispanic, and she was the only minority employed at Defendant Kwiat Eye. *See id.* at 2-3. Additionally, Plaintiff alleged in her charge that, during the course of her employment, Dr. Kwiat made comments in reference to "female body parts," would "say words with a sexual connotation that created an uncomfortable atmosphere[,] and his words and behavior created a

difficult and offensive work environment." *See id.* at 3.  Plaintiff asserted that Dr. Kwiat

discriminated against her and other females by making those offensive comments.  *See id.*

Finally, Plaintiff alleged that she also believed she was terminated because of her age since she

was born in 1971 and the technicians about whom she complained were in their 20s and the

supervisor was in her 30s.  *See id.*

On June 27, 2018, Plaintiff commenced this action against Defendant Kwiat Eye and Dr.

Kwiat (collectively referred to as "Defendants") in New York State Supreme Court in

Montgomery County alleging causes of action of tortious interference with a prospective

contractual relationship and breach of contract because Defendants refused to complete the

Form L, thus delaying her ability to obtain a Texas medical license.  *See* Dkt. No. 2, Orig.

Compl, at ¶¶ 10-33.  On September 19, 2019, the EEOC issued Plaintiff a letter notifying her of

her right to sue and indicating that it was "unable to conclude that the information obtained

establishe[d] violations of the statutes."  *See* Dkt. No. 12-1, EEOC Letter, at 5.  In response,

Plaintiff filed a Proposed Amended Complaint, dated December 6, 2019, in which she added

causes of action of discrimination and retaliation.  *See* Dkt. No. 3, Proposed Amend. Compl.

Defendants then removed this action to this Court on January 10, 2020.  *See* Dkt. No. 1, Notice

of Removal.  Defendants also filed an answer to Plaintiff's state court Complaint and Proposed

Amended Complaint in February 2020.[2]  *See* Dkt. No. 7, Answer.  In Plaintiff's Amended

Complaint, she alleged the following eleven causes of action:

---

[2] In communications with the Court, Defendants admitted that they accepted service of the
Amended Complaint once they removed this case, and it is, in fact, the operative pleading in
this federal case.  *See* Dkt. Note. Feb. 10, 2020.  Plaintiff did not file the Amended Complaint,
as the operative pleading, until March 12, 2020.  *See* Dkt. No. 12.  However, Defendants do not
appear to challenge Plaintiff's Amended Complaint based on statute of limitations grounds, and
the Amended Complaint appears to be the same as the Proposed Amended Complaint that
Defendants answered in February 2020.

(1)  Tortious interference with a prospective contractual relationship against both Defendants;

(2)  Breach of contract against both Defendants;

(3)  Sex harassment in violation of the New York State Human Rights Law ("NYSHRL") against Defendant Kwiat Eye;

(4)  Race/national origin discrimination in violation of NYSHRL against Defendant Kwiat Eye;

(5)  Age discrimination in violation of NYSHRL against Defendant Kwiat Eye;

(6)  Sex harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, against Defendant Kwiat Eye;

(7)  Race/national origin discrimination in violation of Title VII against Defendant Kwiat Eye;

(8)  Age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*, against Defendant Kwiat Eye;

(9)  Retaliation in violation of NYSHRL against Defendant Kwiat Eye;

(10) Retaliation in violation of Title VII against Defendant Kwiat Eye;

(11) Retaliation in violation of the ADEA against Defendant Kwiat Eye.

*See* Dkt. No. 12, Amend. Compl., at ¶¶ 38-99.[3]

Pending before the Court is Defendants' motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See* Dkt. No. 53.  Plaintiff opposes Defendants' motion.  *See* Dkt. No. 63.

---

[3] Initially, Plaintiff filed all eleven causes of action against both Defendants; however, she recently stipulated to discontinue all but the first and second causes of action against Dr. Kwiat individually.  *See* Dkt. No. 54.

- 7 -

## II. DISCUSSION

### A. Summary judgment standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The movant may satisfy this burden "by pointing out the absence of evidence to support the non-movant's claims." *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)).

Once the movant meets this initial burden, the non-moving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322-23, 106 S. Ct. 2548; *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997)).  Specifically, the moving party must cite to "particular parts of materials in the record" or show "that the materials cited [by the non-movant] do not establish the absence or presence of a genuine dispute" as to any material fact.  Fed. R. Civ. P. 56(c)(1)(A)-(B).  The party opposing a motion for summary judgment "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing *D'Amico*, 132 F.3d at 149) (other citation omitted), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) (citations omitted).  "Rather, the nonmoving party must present 'significant probative evidence tending to support the complaint.'"  *Smith v. Menifee*, No. 00 Civ. 2521 (DC), 2002 U.S. Dist. LEXIS

4943, *9 (S.D.N.Y. Mar. 26, 2002) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391

U.S. 253, 290, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)).

## B.  Whether Defendants discriminated against Plaintiff based on her age

Courts analyze a plaintiff's ADEA and NYSHRL claims under the *McDonnell Douglas*

burden-shifting framework.  *See Downey v. Adloox*, 789 F. App'x 903, 905 (2d Cir. 2019)

(summary order) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010)

(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668

(1973)).  "Under this framework, if a plaintiff establishes a *prima facie* case of discrimination,

the defendant must articulate a legitimate, non-discriminatory reason for its action."  *Id.*

(citation omitted).  "If the defendant provides such a reason, 'the plaintiff must then come

forward with evidence that the defendant's proffered, non-discriminatory reason is a mere

pretext for actual discrimination.'"  *Id.* (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42

(2d Cir. 2000)).  "'[T]o defeat summary judgment . . . the [employee's] admissible evidence

must show circumstances that would be sufficient to permit a rational finder of fact to infer that

the [employer's] employment decision was more likely than not based in whole or in part on

discrimination.'"  *Id.* (quoting *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)

(per curiam) (internal quotation marks and citations omitted) (second and third brackets in

original)).  "In an ADEA case, a plaintiff satisfies that burden by providing, 'by a preponderance

of the evidence, that age was the "but-for" cause of the challenged adverse employment action.'"

*Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, 129 S. Ct. 2343, 174 L. Ed. 2d

119 (2009)).  "Because ADEA claims have been held to be identical to NYSHRL claims, both

are analyzed under the same framework."  *Id.* (citing *Gorzynski*, 596 F.3d at 105 n.6).

"To establish a prima facie case of age discrimination, the plaintiff must show (1) that [s]he was within the protected age group, (2) that [s]he was qualified for the position, (3) that [s]he experienced an adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination." *Dunaway v. MPCC Corp.*, 669 F. App'x 21, 23 (2d Cir. 2016) (summary order) (citing [*Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119,] 129 [(2d Cir. 2012)]).   In this case, the parties agree that Plaintiff was in the protected age group in that she was over forty years old, and she experienced an adverse employment action when Defendants terminated her employment.   The parties dispute whether Plaintiff was qualified for her position and whether she was terminated under circumstances giving rise to an inference of discrimination.

First turning to the question of whether Plaintiff was qualified for her position, the Second Circuit has held that, "[a]t the summary judgment stage, a plaintiff may satisfy this burden by showing that she 'possesses the basic skills necessary for performance of [the] job.'" *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) (citation omitted)).   To support her prima facie case, Plaintiff points to the Agreement with Defendant Kwiat Eye.   Plaintiff contends that nothing in the Agreement made it a prerequisite of Plaintiff's employment that she become accredited by the insurance companies.   *See* Dkt. No. 63 at 4.   Plaintiff also asserts that, in her termination letter, Defendants did not cite sections of the Agreement that show that accreditation was a requirement for employment.   *See id.*

In that termination letter, Defendants informed Plaintiff that her "inability to become credentialed with insurance providers of [their] patients, including Fidelis Care (administrator of New York State's Medicaid program) and Excellus BlueCross BlueShield, has prevented

[her] from being able to perform the services for which [she was] hired[.]" *See* Dkt. No. 53-33, Termination Letter, at 3.  Defendants asserted that Plaintiff's employment was terminated under Sections 1.4, 1.5, 10.3, and 10.4 of the Agreement, "and for [her] failure to inform Dr. Kwiat that [her] ability to maintain [her] license to practice ophthalmology in the State of New York may be jeopardized by a Final Order issued by the Texas Medical Board on December 3, 2015, of which [she was] aware before commencing employment with Kwiat Eye." *See id.*

Sections 1.4 and 1.5 of the Agreement provide that Plaintiff represents and warrants as conditions of her employment that she "has not been excluded from or sanctioned by any federal or state health care program," and "she will satisfactorily perform her responsibilities to Employer[.]" *See* Dkt. No. 53-17, Agreement, at §§ 1.4, 1.5.  Sections 10.3 and 10.4 grant Defendant Kwiat Eye the right to terminate Plaintiff's employment for "failure of any of the conditions precedent under Paragraph 1 of [the] Agreement," or "imposition of any sanctions, including exclusion, suspension, or other limitation, relating to [Plaintiff's] Medicare or Medicaid participation[.]" *See id.* at §§ 10.3, 10.4.  Other provisions in Paragraph 1 indicate that Plaintiff represented that she was an ophthalmologist who would be duly licensed in New York no later than March of 2016 and, at the time of her commencement of employment, she would be in good standing to practice ophthalmology in New York and that she would maintain such licensure throughout the term of the Agreement. *See id.* at § 1.1.  Additionally, Plaintiff agreed to "be a participating ophthalmologist in, and accept assignment for payment under the Medicaid and Medicare programs[.]" *See id.* at § 1.2.

According to Dr. Kwiat's affidavit, Fidelis has a contract with the New York State Department of Health to meet the health care needs of people in New York with Medicaid. *See* Dkt. No. 53-16, Dr. Kwiat's Aff., at ¶ 5.  Dr. Kwiat explained that he hired Plaintiff with the

expectation that she would apply and become an approved provider for the insurance companies that worked with Defendant Kwiat Eye, and, in particular, Fidelis. *See id.* at ¶ 14. It is undisputed that Fidelis informed Plaintiff in September 2017 that she did "not meet the criteria for participation in Fidelis' network[.]" *See* Dkt. No. 53-9 at 2. Fidelis specified that it would not consider any subsequent applications from Plaintiff for two years. *See id.* at 2. Following receipt of that letter, Plaintiff responded to Fidelis and asked for an explanation of the criteria or reasons for why she did not meet Fidelis's criteria for participation in its plan. *See* Dkt. No. 53-10 at 2. In its 2018 letter in response, Fidelis again informed Plaintiff that she did not meet Fidelis's criteria to participate in its network, and it informed her that she could re-apply for consideration after she became Board Certified. *See* Dkt. No. 53-11 at 2.

Based on the foregoing, the Court finds that, by failing to obtain approval to act as a provider for Fidelis, Plaintiff was "excluded" from being a provider for Medicare or Medicaid, which violated Sections 1.2, 10.3, and 10.4 of the Agreement. Therefore, since Plaintiff failed to meet the requirements for employment as set forth in the Agreement, the Court finds that Plaintiff has not established that she was qualified for her position in order to make her prima facie case of age discrimination.

Notwithstanding this conclusion, the Court further finds for the following reasons that Plaintiff has not met her prima facie burden to establish that her termination occurred under circumstances giving rise to an inference of discrimination. "'An inference of discrimination can arise from circumstances including, but not limited to, [1] "the employer's criticism of the plaintiff's performance in [age] degrading terms; [2] its invidious comments about others in the employee's protected group; [3] the more favorable treatment of employees not in the protected group; [4] the sequence of events leading to the plaintiff's discharge" [; or 5] . . . when an

- 12 -

employer replaces a terminated or demoted employee with an individual outside the employee's protected class.'" *Lillico v. Roswell Park Comprehensive Cancer Ctr.*, No. 21-CV-836-LJV, 2022 U.S. Dist. LEXIS 104215, *12 (W.D.N.Y. June 10, 2022) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 312-13 (2d Cir. 2015)).  Additionally, "'[a] showing of disparate treatment – that is, a showing that an employer treated plaintiff "less favorably than a similarly situated employee outside his protected group" – is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case.'" *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Id.* at 493-94 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).

Plaintiff points to various facts to support her claim.  First, she asserts that Defendant Kwiat Eye hired Dr. Heather Monge in the summer of 2018, after it terminated her in April 2018.  *See* Dkt. No. 63 at 6.  After reviewing Dr. Monge's LinkedIn profile, Plaintiff concluded that her replacement was "clearly much younger (by decades)" than her.  *See id.*  Initially, the Court notes that Plaintiff did not attach copies of Defendant Kwiat Eye's *Meet the Doctors* website or Dr. Monge's LinkedIn page, on which she relies, as exhibits in opposition to Defendants' motion for summary judgment.  Nonetheless, Defendants point out that Dr. Monge was an *optometrist*, not an *ophthalmologist* like Plaintiff.  *See* Dkt. No. 68 at 9.  Plaintiff also points out that Dr. Siahpoosha, who was in her 20's at the time, was also not credentialed through Fidelis throughout the same time that Plaintiff was not credentialed, yet Defendants did not terminate Dr. Siahpoosha.  *See* Dkt. No. 63 at 6.  According to Defendants, Dr. Siahpoosha

was also an optometrist.  *See* Dkt. No. 68 at 9.  Defendant Kwiat Eye's website, on which

Plaintiff relies, also identifies both Dr. Siahpoosha and Dr. Monge as licensed optometrists.  *See*

Meet the Doctors, Kwiat Eye & Laser Surgery, https://www.kwiateye.com/meet-the-

doctors.htm (last accessed Jan. 9, 2023).  The Court finds that optometrists and

ophthalmologists do not engage in comparable conduct, nor are they subject to the same

performance and discipline standards; most notably, ophthalmologists are Doctors of Medicine

and can perform surgery, whereas optometrists – who are Doctors of Optometry – cannot.  *See*

*Optometrist or Ophthalmologist: Which is Best for Your Eye Care?*, Cleveland Clinic,

https://health.clevelandclinic.org/optometrist-or-ophthalmologist-which-is-best-for-your-eye-

care/ (last accessed Jan. 9, 2023).  Thus, the Court concludes that Plaintiff cannot show an

inference of age discrimination by relying on Defendants' treatment of Dr. Siahpoosha and

Defendants' hiring Dr. Monge because neither are "similarly situated" to her.

      In addition, the parties do not dispute that Dr. Kwiat is only three years younger than

Plaintiff, both are in the same protected class of individuals over the age of 40, and both parties

were members of that protected class when Plaintiff was hired and terminated.  Plaintiff

contends that inferences of discrimination can still be found where the person who

discriminated against the plaintiff is a member of the same protected class for which the

plaintiff claims she was discriminated.  *See* Dkt. No. 63 at 8.  However, she fails to point to any

disparaging comments Dr. Kwiat made about Plaintiff's age or older workers in general or even

assert that any of Defendant Kwiat Eye's employees referenced her age.  Without such claims,

the Court finds that Plaintiff has not demonstrated that Defendants discriminated against her

because of her age.

Relatedly, it is undisputed that Dr. Kwiat was the same party that both hired and terminated Plaintiff within a two-year period.  Defendant points to the "same-actor" inference, which provides that "'if the person who fires an employee is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against that employee.'"  *Colandrea v. Hunter-Tannersville Cent. Sch. Dist.*, No. 1:15-CV-0456 (LEK/ATB), 2017 U.S. Dist. LEXIS 41551, *25 (N.D.N.Y. Mar. 22, 2017) (quoting *Carlton*, 202 F.3d at 132).  As Plaintiff points out, the same-actor inference is "permissive, not mandatory[.]"  *Id.*  However, as stated above, there are no facts in the record such as references to Plaintiff's age or comments about older employees in the workplace that would compel the Court to ignore the inference.  Accordingly, the Court finds that the same-actor inference applies, and Defendant is entitled to an inference that it did not discriminate against Plaintiff because Dr. Kwiat both hired and fired her.  The Court therefore finds that Plaintiff has failed to allege sufficient facts to establish that her termination arose from age discrimination.  As such, Plaintiff has not met her prima facie burden of showing a claim of age discrimination; and, thus, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's ADEA and NYSHRL age discrimination claims and dismisses those claims.

### C.  Whether Defendants discriminated against Plaintiff based on her race or national origin

Claims of discrimination based on race or national origin brought under Title VII and the NYSHRL are subject to the same *McDonnell Douglas* burden-shifting analysis outlined above with respect to Plaintiff's age discrimination claim.  *See Abboud v. Cnty. of Onondaga*, 341 F. Supp. 3d 164, 178 (N.D.N.Y. 2018).  Once again, the parties dispute whether Plaintiff has satisfied the second and fourth elements of her prima facie burden in that Defendants argue

that Plaintiff failed to show she was qualified for her position, and she has not shown that her termination took place under circumstances giving rise to an inference of discrimination based on race or national origin.  As discussed above, the Court finds that Plaintiff has failed to show that she was qualified for her position pursuant to the Agreement because Fidelis – New York State's insurance provider for individuals with Medicaid – excluded Plaintiff from becoming a participating provider.  The Court therefore concludes that Plaintiff failed to meet her prima facie burden with respect to her disparate treatment claim based on race or national origin.

Notwithstanding this conclusion, and for the below-stated reasons, the Court finds that Plaintiff failed to meet her prima facie burden with respect to the fourth element because she has not offered admissible evidence showing that her termination took place under circumstances giving rise to an inference of discrimination based on race or national origin. With respect to Plaintiff's prima facie burden of showing an inference of discrimination, she points to the following facts: (1) she was the only Hispanic employee who worked for Defendant Kwiat Eye; (2) Dr. Kwiat allegedly made a comment that he did not believe in race discrimination while in Plaintiff's presence; (3) similarly situated non-Hispanic employees were treated differently from her; and (4) the technicians and Dr. Kwiat made racially disparaging remarks about Hispanic patients.  *See* Dkt. No. 63 at 10-12.

Initially, the Court finds that the same-actor inference once again applies because Dr. Kwiat knew that Plaintiff was Hispanic when he hired her, employed her for two years, and when he fired her.  *See generally Colandrea*, 2017 U.S. Dist. LEXIS 41551 at *25. Furthermore, as with Plaintiff's age discrimination claims, she does not allege that Dr. Kwiat or any of Defendant Kwiat Eye's other employees made racially disparaging remarks to Plaintiff, commented on her race or national origin at all, or used invidious or derogatory language in

- 16 -

front of her about Hispanic individuals.  Her only allegations otherwise involved Dr. Kwiat's

general opinion, made in front of Plaintiff and other employees, that he did not believe race

discrimination existed and her claim that non-Hispanic employees were treated differently than

her, which she does not attempt to support by pointing to any admissible evidence in the record.

Even when considering those claims in the light most favorable to Plaintiff, the Court finds that

such vague allegations – made without evidentiary support – are insufficient to establish the

fourth element of Plaintiff's prima facie burden, *i.e.*, that the circumstances surrounding her

termination give rise to an inference of discrimination.  Additionally, with respect to Plaintiff's

argument that Ms. Foster confirmed in her deposition that the technicians and Dr. Kwiat

occasionally discussed patients in derogatory terms, those allegations were neither in Plaintiff's

EEOC charge nor in her Amended Complaint; and, thus, they cannot support her discrimination

claims based on race or national origin.  *See generally* Dkt. Nos. 12, 12-1.

Turning to Plaintiff's allegation that she suffered a hostile work environment based on

her race or national origin under Title VII and the NYSHRL, a plaintiff must establish two

elements in order to prevail on such claims: "(1) that the workplace was permeated with

discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of

[her] work environment, and (2) that a specific basis exists for imputing the conduct that created

the hostile environment to the employer."  *Prude v. Logistics One Transp., Inc.*, No. 1:20-cv-

0674, 2022 U.S. Dist. LEXIS 162523, *17 (N.D.N.Y. Sept. 9, 2022) (Hurd, J.) (citing *Alfano v.

Costello*, 294 F.3d 365, 372 (2d Cir. 2002)).  Plaintiff relies on the exact same facts from her

disparate treatment claims on the basis of race and national origin to support her hostile work

environment claim on those bases.  *See* Dkt. No. 63 at 12-13.  As discussed above, Plaintiff

simply alleges that Dr. Kwiat voiced his opinion about race discrimination in front of her and

others, and she makes other general allegations without support and without having included them in her EEOC charge or her Amended Complaint. The Court therefore finds that, even construing those facts in Plaintiff's favor, they are not so severe or pervasive that they altered the conditions of her work environment. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's Title VII and NYSHRL discrimination and hostile work environment claims on the basis of race or national origin and dismisses those claims.

### D. Whether Defendants discriminated against Plaintiff on the basis of sex

"Courts analyze claims of disparate treatment on the basis of sex under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)," which the Court outlined above with respect to Plaintiff's age, race, and national origin disparate treatment claims. *Dotson v. City of Syracuse*, 763 F. App'x 39, 41 (2d Cir. 2019) (summary order). As discussed with respect to Plaintiff's other disparate treatment claims, Defendants maintain that Plaintiff failed to satisfy her prima facie burden as to the second and fourth elements in that they do not believe that Plaintiff showed she was qualified for her position or that her termination took place under circumstances giving rise to an inference of discrimination on the basis of sex. Relying on its analysis above, the Court again finds that Plaintiff failed to show that she was qualified for her position pursuant to the Agreement because she was excluded from becoming a participating provider for Fidelis, which contracts with New York to provide insurance for individuals with Medicaid

Notwithstanding this conclusion, the Court further finds for the subsequently-stated reasons that Plaintiff failed to meet her prima facie burden with respect to the fourth element. Although Plaintiff alleges that Dr. Kwiat made various comments about female genitalia and

the use of women for sex, she does not allege that those comments were made to her, nor does she explain why the same-actor inference would not apply, since Dr. Kwiat knew that Plaintiff was a woman when he hired her and when he later fired her; and, in fact, it is undisputed that nearly every employee in Plaintiff's workplace was a woman other than Dr. Kwiat. Thus, because Plaintiff failed to offer evidence showing that her termination took place under circumstances giving rise to an inference of sex-based discrimination, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's sex-based disparate treatment claims and dismisses those claims.

Similar to Plaintiff's race and national-origin based hostile work environment claims, "'[t]o state a hostile work environment claim in violation of Title VII [on the basis of sex], a plaintiff must plead facts that would tend to show that the complained of conduct: (1) "is objectively severe or pervasive, that is, . . . the conduct creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's sex[.]"'" *Stern v. McDonough*, No. 5:18-CV-71 (MAD/TWD), 2022 U.S. Dist. LEXIS 165540, *15 (N.D.N.Y. Sept. 14, 2022) (D'Agostino, J.) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001))). Notably, "'a few isolated incidents of "boorish or offensive use of language" are generally insufficient to establish a hostile work environment.'" *Dollinger v. N.Y. State Ins. Fund*, No. 3:14-CV-908 (MAD/ML), 2019 U.S. Dist. LEXIS 165180, *16 (N.D.N.Y. Sept. 26, 2019) (D'Agostino, J.) (quoting [*Salmon v. Pliant*, 965 F. Supp. 2d 302, 305 (W.D.N.Y. 2013)] (citations omitted)).

"For claims under Title VII, an aggrieved employee must file an administrative complaint with the [EEOC] within 300 days of the alleged discriminatory act." *Prude*, 2022

- 19 -

U.S. Dist. LEXIS 162523 at *14 (citing *Allen v. New York City Dep't of Env't Prot.*, 51 F. Supp.

3d 504, 510 (S.D.N.Y. 2014); *see also* 42 U.S.C. § 2000e-5(e)).  "As for claims under the

NY[S]HRL, the statute of limitations is three years from the date that the claim accrues,

measured from the filing of the action in court." *Id.* (citing *Sesay-Harrell v. NYC Dep't of*

*Homeless Servs.*, 2013 U.S. Dist. LEXIS 170160, 2013 WL 6244158, at *12 (S.D.N.Y. Dec. 2,

2013) (citations omitted); *see also* N.Y. C.P.L.R. § 214(2)) (footnote omitted).  "'Under the

continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an

EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing

policy of discrimination, all claims of acts of discrimination under that policy will be timely

even if they would be untimely standing alone.'" *Id.* at *14-*15 (quoting *Patterson v. Cnty. of*

*Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) (citation omitted)) (footnote omitted).  "To

bring a claim within the continuing violation exception, a plaintiff must at the very least allege

that one act of discrimination in furtherance of the ongoing policy occurred within the

limitations period." *Id.* at *15 (citation omitted).  "However, the doctrine 'is disfavored and will

be applied only upon a showing of compelling circumstances.'" *Mills-Sanchez v. Research*

*Found.*, No. 1:18-cv-723 (GLS/DJS), 2019 U.S. Dist. LEXIS 102926, *15 (N.D.N.Y. June 20,

2019) (Sharpe, S.J.) (quoting *Abboud v. County of Onondaga, New York*, 341 F. Supp. 3d 164,

177 (N.D.N.Y. 2018) (internal quotation marks and citation omitted)).

      Plaintiff alleges that she suffered a sex-based hostile work environment based on three

specific incidents.  First, she alleges that, in March 2018, Dr. Kwiat loudly asked, in her

presence and the presence of other staff members, why a vagina was shaped the way it was, and

he repeated the question when no one replied.  *See* Dkt. No. 12 at ¶ 13.  Second, Plaintiff

contends that, in July 2017, Dr. Kwiat stated in the presence of her and other staff members that

another staff member should not have any more children because "her vagina would stretch." *See id.* at ¶ 14.  Third, on an occasion that Plaintiff testified occurred sometime in 2016, she allegedly heard Dr. Kwiat state to other employees that women were "only good for sex."  *See id.* at ¶ 15; *see also* Dkt. No. 53-7, Pl's Depo, at 72:14-73:13.  With respect to Plaintiff's Title VII hostile work environment claim, Plaintiff admits that two out of three of these allegations of sex-based discrimination occurred more than three hundred days before she filed her complaint with the EEOC on May 29, 2018.  However, she argues that the continuing violation doctrine allows the Court to consider them.  Contrary to Plaintiff's claim, the Court finds that the continuing violation doctrine does not apply because she has not shown that those three isolated incidents – each occurring approximately one year apart from each other – are the result of a discriminatory *policy*.[4]  *See Dollinger*, 2019 U.S. Dist. LEXIS 165180, at *13-*14.

Since the continuing violation doctrine does not apply, then the only allegation Plaintiff makes to support her Title VII sex-based hostile work environment claim pertains to Dr. Kwiat's March 2018 comment, in Plaintiff's and other staff members' presence, regarding the shape of vaginas.  Such a singular, isolated incident was likely boorish and offensive, but, on its own, it is insufficient to establish a sex-based hostile work environment claim.  Thus, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's hostile work environment claim pursuant to Title VII on this basis and dismisses that claim.

Regarding Plaintiff's NYSHRL claim, in which the Court may consider all three incidents, the Court additionally finds that those incidents, while offensive and inappropriate,

---

[4] Even if the continuing violation doctrine applied, the analysis would be the same as it is under the NYSHRL with respect to those three isolated incidents.  As discussed, *infra*, the Court dismisses that claim because Plaintiff failed to show that she suffered from a sex-based hostile work environment.

were not so severe or pervasive as to establish a hostile work environment.  The Court therefore

grants Defendants' motion for summary judgment with regard to Plaintiff's sex-based hostile

work environment claim brought under the NYSHRL and dismisses that claim.


### E.  Whether Defendants retaliated against Plaintiff

The *McDonnell Douglas* burden-shifting framework applies to Plaintiff's retaliation claims

brought pursuant to Title VII, the NYSHRL, and the ADEA.  *See Summa v. Hofstra Univ.*, 708

F.3d 115, 125 (2d Cir. 2013); *Massaro v. New York City Dep't of Educ.*, No. 21-266-cv, 2022

U.S. App. LEXIS 15143, *2 (2d Cir. June 2, 2022) (summary order).  "To make out a prima

facie case of retaliation, a plaintiff must make four showings: that '(1) she engaged in a

protected activity; (2) her employer was aware of this activity; (3) the employer took adverse

employment action against her; and (4) a causal connection exists between the alleged adverse

action and the protected activity.'"  *Summa*, 708 F.3d at 125 (quoting [*Schiano v. Quality

Payroll Sys.*, 445 F.3d 597,] 608 [(2d Cir. 2006)]).  "'Once a prima facie case of retaliation is

established, the burden of production shifts to the employer to demonstrate that a legitimate,

nondiscriminatory reason existed for its action.'"  *Id.* (quoting *Raniola v. Bratton*, 243 F.3d 610,

625 (2d Cir. 2001)).  "If the employer demonstrates a legitimate, non-discriminatory reason,

then '[t]he burden shifts . . . back to the plaintiff to establish through either direct or

circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory

retaliation.'"  *Id.* (quoting [*Raniola*, 243 F.3d] at 625).

"'The term "protected activity" refers to action taken to protest or oppose statutorily

prohibited discrimination.'"  *Comerford v. N. Syracuse*, No. 5:18-cv-01143 (BKS/TWD), 2021

U.S. Dist. LEXIS 46299, *92-*93 (N.D.N.Y. Mar. 12, 2021) (Sannes, J.) (quoting *Cruz v.*

*Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).  "Further, 'opposition to a Title VII

violation need not rise to the level of a formal complaint in order to receive statutory

protection.'"  *Id.* at *93 (quoting [*Cruz*, 202 F.3d at 566]).  "Instead, '"opposition" includes

activities such as "making complaints to management, writing critical letters to customers,

protesting against discrimination by industry or by society in general, and expressing support of

co-workers who have filed formal charges."'"  *Id.* (quoting [*Cruz*, 202 F.3d at 566] (quoting

*Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990))).  "'"[I]mplicit in the

requirement that the employer [was] aware of the protected activity is the requirement that the

[employer] understood, or could have reasonably understood," that the plaintiff's complaints,

constituting the protected activity, were based on conduct prohibited by Title VII.'"  *Id.* (quoting

*Rosioreanu v. City of New York*, 526 F. App'x 118, 120 (2d Cir. 2013) [(summary order)]

(quoting *Galdieri-Ambrosini v. National Realty & Dev. Cor.*, 136 F.3d 276, 292 (2d Cir.

1998))).

  Here, Plaintiff claims that her protected activities included making internal complaints

to Ms. Foster about various sexual comments that Dr. Kwiat made in 2016, 2017, and 2018.

*See* Dkt. No. 63 at 19-20.[5,6]  In Plaintiff's affidavit, she stated that, throughout her employment,

Dr. Kwiat "exhibited crass and unprofessional behavior not befitting of a doctor and employer,"

and she complained to Ms. Foster "on several occasions" in 2017 and 2018.  *See* Dkt. No. 61 at

---

[5] Plaintiff does not assert in her memorandum of law that she complained about discrimination based on age, race, or national origin or that she complained to anyone other than Ms. Foster. *See generally* Dkt. No. 63 at 18-20.

[6] Plaintiff also generally references her March 28, 2018 complaints to Dr. Kwiat, but a review of the transcript of that conversation shows that her complaints entirely pertained to the technicians' competency and did not address any alleged discrimination.  *See generally* Dkt. No. 53-13.

¶¶ 22-23.  Similarly, at her deposition, Plaintiff testified that she told Ms. Foster about Dr. Kwiat's allegedly inappropriate statements on three different occasions, although she could not remember exactly what she said to Ms. Foster.  *See* Dkt. No. 61-4, Pl's Depo, at 73:17-74:24. With respect to her complaint about Dr. Kwiat's alleged comment regarding whether one of the staff members should have more children, Plaintiff stated that Ms. Foster "didn't do anything about it[.]"  *See id.* at 77:22-78:7.  Plaintiff also asserted that she did not make any written complaints about Dr. Kwiat's behavior.  *See id.* at 78:8-11.  Although she now generally asserts otherwise in her memorandum of law, Plaintiff did not claim in either her affirmation or in her deposition that Ms. Foster reported her complaints to Dr. Kwiat or anyone at Defendant Kwiat Eye.  *See generally id.* at 74-77; Dkt. No. 61 at ¶¶ 21-22.

At Ms. Foster's deposition, she testified that she worked as the Clinical Director for Defendant Kwiat Eye, in which she oversaw day-to-day operation of the surgery center.  *See* Dkt. No. 53-12, Foster Depo, at 7:12-21.  Ms. Foster stated that she "vaguely remember[ed]" a conversation with Plaintiff about Dr. Kwiat's alleged statement that women "are only good for two things, and one of them [is] sex[.]"  *See id.* at 42:14-20.  As for Dr. Kwiat's alleged comment about a staff member's pregnancy, Ms. Foster testified that she could not say yes or no as to whether anyone complained to her about his comment because all of the staff members "talked about things all the time whenever they happened."  *See id.* at 44:3-9.  When asked whether Ms. Foster ever heard Plaintiff complain about inappropriate comments or statements that Dr. Kwiat allegedly made, Ms. Foster responded that Plaintiff would "come to the surgery center" to "let [her] know," but that Plaintiff "[d]idn't really say too much."  *See id.* at 137:16-21.  Ms. Foster generally remembered Plaintiff complaining that Dr. Kwiat's conduct was inappropriate, but she could not remember exactly what Plaintiff said.  *See id.* at 137:22-138:5.

Ms. Foster did not indicate that she told Dr. Kwiat or anyone at Defendant Kwiat Eye about Plaintiff's complaints or that she was in charge of handling such complaints. *See generally* Dkt. No. 53-12.

Moreover, in Dr. Kwiat's affidavit, he attested that, to the best of his knowledge, at no point in time while Plaintiff was employed by Defendant Kwiat Eye, did she ever raise any concern to him or to anyone else about discrimination or harassment, including any concerns about sexual harassment in the workplace, nor did he ever learn of any formal complaints. *See* Dkt. No. 53-16 at ¶ 25. Although Plaintiff claimed that she raised a concern about sexual harassment to Ms. Foster, Dr. Kwiat noted that Ms. Foster "was not in a position to receive or process any such complaints under the Kwiat Eye and Laser Surgery Policies and Procedures manual"; and, at no time, did Ms. Foster, or anyone on her behalf, advise Dr. Kwiat that Plaintiff raised or expressed any concerns to Ms. Foster about discrimination or harassment. *See id.*

Looking at the evidence in the light most favorable to Plaintiff, and based on Plaintiff's and Ms. Foster's deposition testimonies, the Court finds that Plaintiff internally complained to someone in a managerial position about Dr. Kwiat's sex-based comments when she complained to Ms. Foster, and such complaints constitute a protected activity. *See LeRoy v. Delta Air Lines*, No. 21-267-cv, 2022 U.S. App. LEXIS 29352, *12 (2d Cir. Oct. 21, 2022) (summary order) (ruling that "[e]ven if a complaint is ultimately without merit, lodging the complaint is a protected activity so long as it was 'motivated by a good faith, reasonable belief that the underlying employment practice was unlawful.'" (quoting *Kwan*, 737 F.3d at 843 (internal quotation marks omitted))). Nonetheless, the Court finds that Plaintiff has not established the second element of her prima facie case, *i.e.*, that her employer was aware of her complaints.

The admissible evidence in the record reveals that Plaintiff did not allege any firsthand knowledge that Ms. Foster reported her complaints to Dr. Kwiat, Ms. Foster never asserted that she reported them to him or anyone at Defendant Kwiat Eye, and Dr. Kwiat attested that he never learned of any such complaints about discrimination or harassment. Thus, the Court finds that there is no genuine issue of material fact as to whether Plaintiff's employer knew of her complaints; and, since it did not, Plaintiff cannot satisfy her prima facie burden. As such, the Court grants summary judgment to Defendants on Plaintiff's retaliation claims and dismisses those claims.

### F. Whether Defendants tortiously interfered with Plaintiff's prospective employment

"'[U]nder New York law, "[t]ortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom."'" *Adecco USA, Inc. v. Staffworks, Inc.*, No. 6:20-CV-744 (MAD/TWD), 2022 U.S. Dist. LEXIS 198225, *23 (N.D.N.Y. Nov. 1, 2022) (D'Agostino, J.) (quoting *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 Fed. Appx. 102, 104 (2d Cir. 2012) (quoting *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996))).

To the extent Plaintiff alleges a claim of tortious interference with contract, she points to Defendants' conduct in refusing to fill out the Form L as interfering with "at least two potential employment opportunities." *See* Dkt. No. 12 at ¶¶ 39-41. In Plaintiff's memorandum of law, she argues that prospective employer, the Valley Retina Institute ("Valley Retina"), sent her a written job offer, which indicated that her employment was contingent upon her obtaining a valid Texas medical license, and she could not obtain that medical license since Defendants did

not fill out the Form L.  *See* Dkt. No. 63 at 26.  However, Plaintiff did not attach this

employment agreement to her memorandum of law or otherwise submit it to the Court.

Without this evidence and basing her claim only on "prospective job offers," the Court finds

that Plaintiff has not met her burden of showing "the existence of a valid contract between [her]

and a third party" to satisfy her first cause of action against Defendants for tortious interference

with contract.  *Adecco USA, Inc.*, 2022 U.S. Dist. LEXIS 198225, at *23.

Separately, "[u]nder New York law, tortious interference with business relations occurs

'where the third party would have entered into or extended a contractual relationship with

plaintiff but for the intentional and wrongful acts of the defendant.'"  *Albany Molecular*

*Research, Inc. v. Schloemer*, No. 1:10-CV-210 (LEK/DRH), 2010 U.S. Dist. LEXIS 132007,

*20 (Dec. 14, 2010) (Kahn, J.) (quoting *WFB Telecommunications*, 188 A.D.2d 257, 590

N.Y.S.2d 460).  "The plaintiff, in such actions, bears the burden of proving that the defendant's

conduct was motivated solely by malice, *see M.J. & K. Co., Inc. v. Matthew Bender and Co.,*

*Inc.*, 220 A.D.2d 488, 631 N.Y.S.2d 938, 940 (2d Dep't 1995), 'or, failing that level of malice,

use[d] dishonest, unfair, or improper means . . . ' to damage the relationship between the

plaintiff and third party.  *Goldhirsh Group, Inc. v. Alpert*, 107 F3d 105 (2d Cir. 1997)."  *Id.* at

*20-*21 (other citation and parenthetical omitted).  Courts have also recognized an exception

"where a defendant engages in conduct for the sole purpose of inflicting intentional harm on

plaintiffs or employs wrongful means."  *Adecco USA, Inc.*, 2022 U.S. Dist. LEXIS 198225, at

*26 (quotations omitted).  "'Wrongful means "include physical violence, fraud or

misrepresentation, civil suits and criminal prosecutions, and some degrees of economic

pressure."'"  *Id.* (quoting [*Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d

547, 566 (S.D.N.Y. 2020)] (quoting *Carvel Corp.* [*v. Noonan*], 3 N.Y.3d [182,] 191 [(N.Y. 2004)]])).

To the extent that Plaintiff alleges tortious interference with a prospective business relationship, Plaintiff repeats her argument that Defendants failed to fill out the Form L so that she could not obtain her Texas medical license, and she also argues that Defendants refused to contact prospective employers to provide them basic information about her employment.  *See* Dkt. No. 63 at 25-27.  Plaintiff believes that such refusals cost her job opportunities with Valley Retina and Chenango Valley Eye Associates ("Chenango Eye").  *See id.*  With respect to Defendants not filling out the Form L, Plaintiff generally concludes that such conduct was done maliciously.  However, Plaintiff has not pointed to any admissible evidence to support that conclusion.  At best, Plaintiff argues, Defendants knew that, without the Form L, she could not get her medical license in Texas and would be ineligible for jobs there, including with Valley Retina.  This evidence is completely speculative; and, as Defendants point out, there was no guarantee that with the Form L she would have received her Texas medical license, as the State of Texas had already refused to license her in 2015.  Furthermore, such speculation does not necessarily support the conclusion that Defendants' sole motive in refusing to fill out the Form L was malicious.  There is also undisputed evidence in the record that Defendants wanted Plaintiff to sign a waiver of claims for its own protection before filling out the Form L, which Plaintiff refused to sign.

Additionally, with respect to Plaintiff's claim that Defendants did not return phone calls to prospective employers, including Chenango Eye, both parties admit that Chenango Eye ultimately received the information it requested from Defendant Kwiat Eye.  Plaintiff has not submitted any admissible, non-hearsay evidence that any delay in Defendants' providing that

information to Chenango Eye resulted in her losing out on an opportunity to work there.

Plaintiff has also failed to point to any evidence that Defendants' alleged delay in contacting

Chenango Eye was done maliciously and solely for the purpose of intentionally harming her.

Plaintiff has not pointed to any other prospective employers that Defendants failed to contact.

Thus, for all of these reasons, the Court finds that Plaintiff has not established a claim for

tortious interference with business relations.  Accordingly, the Court grants Defendants' motion

for summary judgment with respect to Plaintiff's first cause of action and dismisses that claim.


### G.  Whether Defendants breached the Agreement

"Under New York law, a breach of contract claim requires (1) a contract, (2) adequate

performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4)

damages."  *Palomo v. Demaio*, 403 F. Supp. 3d 42, 64 (N.D.N.Y. 2019) (citing *Eternity Glob.*

*Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

Plaintiff alleges that Defendants breached the Agreement in the following three ways: (1)

terminating her employment immediately rather than giving her 180-days' notice; (2) failing to

pay Plaintiff for her unused vacation time; and (3) failing to pay Plaintiff her incentive

compensation for 2017.  *See* Dkt. No. 63 at 28-33.


#### a.  *Employment termination*

Plaintiff alleges in her Amended Complaint that she was entitled to 180 days' notice of

her termination.  *See* Dkt. No. 12 at ¶¶ 42-45.  The Agreement provides that Defendant Kwiat

Eye had the right to terminate Plaintiff's employment "immediately" upon the occurrence of,

among other things, (1) Plaintiff's termination, suspension, non-renewal, or revocation of her

license to practice ophthalmology in New York; (2) expulsion, suspension, or other final

disciplinary action against her by a professional organization as a result of her professional

misconduct; (3) failure of any of the conditions precedent under Paragraph 1 of the Agreement;

or (4) imposition of any sanctions, including exclusion, suspension, or other limitation, relating

to Plaintiff's Medicare or Medicaid participation.  *See* Dkt. No. 53-17 at §§ 10.1, 10.2, 10.3,

10.4.  Notwithstanding any other provision of the Agreement, either party agreed that they may

terminate it by giving 180 days' written notice of termination.  *See id.* at § 10.9.  As discussed

above, the Court finds that Plaintiff failed to obtain approval to act as a provider for Fidelis;

and, thus, Plaintiff was "excluded" from being a provider for Medicare or Medicaid, which

violated Sections 1.2, 10.3, and 10.4 of the Agreement.  The Court thus finds that Defendants

had the right to terminate Plaintiff's employment "immediately" under the terms of the

Agreement, rather than provide 180 days' notice of such termination.  Therefore, the Court

grants Defendants' motion for summary judgment and dismisses Plaintiff's breach of contract

claim against Defendants with respect to this issue.


### b. Vacation time

Plaintiff also complained that Defendants did not pay her for her 15 unused days of

earned time off for 2018.  *See* Dkt. No. 12 at ¶¶ 46-48.  Both parties rely on the axiom "that an

employee has no inherent right to paid vacation and sick days, or payment for unused vacation

and sick days, in the absence of an agreement, either express or implied."  *Sosnowy v. A. Perri

Farms, Inc.*, 764 F. Supp. 2d 457, 475 (E.D.N.Y. 2011); *see Kolesnikow v. Hudson Valley

Hosp. Ctr.*, 622 F. Supp. 2d 98, 120 (S.D.N.Y. 2009) (ruling that "[a]n employee's entitlement

to receive payment for accrued, unused paid time off upon termination of employment is

governed by the terms of the employer's publicized policy" (citations omitted)).  However, the

cases on which both parties rely pertain to rules about recovering unused paid time off under

New York's Labor Law.  Plaintiff has not alleged a violation of New York's Labor Law; instead, she alleges that Defendants breached the Agreement in failing to pay her accrued vacation time after her termination.

Looking at the terms of the Agreement, Section 7.1 provides that Plaintiff "shall be entitled to fifteen (15) days of compensated leave during each calendar year[.]"  *See* Dkt. No. 53-17 at § 7.1.  The parties do not dispute that the Agreement is silent as to whether Plaintiff is entitled to payment for her accrued, unused paid time off in the event of her termination.  The New York Court of Appeals has held that a court's "role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract," and that there may not even be a need to look beyond the contract when it "is silent on the disputed issue."  *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (N.Y. 2004).  Furthermore, "'[a] contract's silence on an issue does not "create an ambiguity which opens the door to the admissibility of extrinsic evidence to determine the intent of the parties."'"  *Donohue v. Hochul*, 32 F.4th 200, 208 (2d Cir. 2022) (quoting [*Donohue v. Cuomo*, 38 N.Y.3d 1,] 13 [(N.Y. 2022)] (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 570, 573, 780 N.E.2d 166, 750 N.Y.S.2d 565 (2002) (internal citations omitted))).

In this case, it is an undisputed that there is no language in the Agreement that provides Plaintiff with the express or implied right to payment for unused vacation and sick days.[7]  There is also nothing inherently ambiguous about the absence of that provision.  The Court therefore finds that the parties, who are educated and sophisticated, must have intentionally agreed not to include such benefits in the Agreement; and the Court chooses not to read such a provision into

---

[7] Although there is language to that effect in Defendants' Polices & Procedures, the Agreement does not incorporate those Policies & Procedures within it and expressly states that it constitutes the full and entire Agreement.  *See* Dkt. No. 53-17 at § 11.

it.  Therefore, the Court finds that Plaintiff cannot point to a provision of the Agreement that

Defendants breached in failing to pay her for her accrued vacation days following her

termination; and, accordingly, the Court grants Defendants' motion for summary judgment and

dismisses Plaintiff's breach of contract claim against Defendants with respect to this issue.


### c.  *Incentive compensation*

Lastly, Plaintiff claims that Defendants breached the Agreement because they did not

pay her incentive compensation for 2017.  *See* Dkt. No. 12 at ¶¶ 49-51.  With respect to

Plaintiff's incentive compensation, the Agreement indicates that, in addition to Plaintiff's base

wage, she would be eligible for additional compensation.  *See* Dkt. No. 53-17, Employment

Agreement, at § 4.2.  The Agreement further provides the following:

> At the end of each calendar year (January-December)
> worked by [Plaintiff], [Defendant Kwiat Eye] will calculate the
> total fees which were actually collected and attributable to
> services rendered by [Plaintiff].
> [Plaintiff] will be eligible to receive incentive
> compensation of $50,000.00 if fees actually collected and
> attributable to services rendered by [her], exceed one million
> dollars ($1,000,000.00).  [Plaintiff] is eligible for this incentive
> starting January 2017.

*See id.* at § 4.3.

Defendants attached an affidavit from Elizabeth Kwiat, Defendant Kwiat Eye's

bookkeeper, to their motion, in which Ms. Kwiat affirmed that, on October 5, 2016, she emailed

Plaintiff and "intended to list the total amounts that [Defendant] Kwiat Eye collected each

month in 2017 from all insurance companies for work performed on their insureds."  *See* Dkt.

No. 53-40, E. Kwiat Aff., at ¶ 2.  Ms. Kwiat declared that the amounts listed in her email

showed that Defendant Kwiat Eye collected more than $1 million in fees through September

2017; however, those amounts were incorrect and actually constituted the total fees *billed* for each month in 2017 – not the total fees *collected* for each month.  *See id.*  Ms. Kwiat explained that, in most months, Defendant Kwiat Eye collects "far less than it actually bills insurance companies for services performed."  *See id.*  After realizing her error, Ms. Kwiat asserted that she sent another email to Plaintiff on November 11, 2017, listing the amounts actually collected through October 2017, which totaled $645,256.55.  *See id.*  Ms. Kwiat attached those emails as exhibits to her affidavit.  *See id.*

In Ms. Kwiat's affidavit, she attested that Defendant Kwiat Eye collected $110,029.33 in fees from Plaintiff's services in October 2017, $101,543.97 in November 2017, and $56,862.75 in December 2017.  *See id.* at ¶ 3.  Ms. Kwiat also ran a report using the MEDENT medical practice management software that Defendant Kwiat Eye used for a number of purposes, including billing and accounting.  *See id.* at ¶ 4.  Ms. Kwiat declared that the report showed that Defendant Kwiat Eye charged $2,212,600.46 for services Plaintiff performed in 2017 and collected $1,359,445.06 for those services.  *See id.*  However, Ms. Kwiat clarified that the amount collected "must be adjusted to reflect the cost of the drugs and other medications that [Plaintiff] used to perform her services that were billed, and the amounts that were actually received for those drugs."  *See id.*  Once accounting for reimbursements for the costs of drugs used to perform her services, Ms. Kwiat calculated that Defendant Kwiat Eye collected $797,955.91 in fees for the services Plaintiff performed in 2017.  *See id.*

Plaintiff challenges Ms. Kwiat's calculations as "inaccurate and misleading."  *See* Dkt. No. 61, Pl's Aff., at ¶¶ 25-26.  The Court agrees with Plaintiff that many of Ms. Kwiat's calculations do not add up or are plainly contradictory.  For example, in Ms. Kwiat's corrected November 11, 2017 email to Plaintiff, she indicates that Plaintiff's total collected fees from

January 2017 through October 2017 were $645,256.55.  *See* Dkt. No. 53-42 at 2.  Ms. Kwiat also affirmed, and attached emails in support, showing that Defendant Kwiat Eye collected $101,543.97 for Plaintiff's services in November 2017 and $56,862.75 for her services in December 2017.  *See* Dkt. No. 53-40 at ¶ 3; Dkt. No. 53-43 at 3-4.  Adding those sums together, Defendant Kwiat Eye would have collected a total of $803,663.27 for Plaintiff's services in 2017, which would make Plaintiff ineligible for the incentive compensation even without adjusting for drug reimbursements.  However, Ms. Kwiat does not come to that conclusion.  *See generally* Dkt. No. 53-40.

Instead, she next asserts that she ran a report using the MEDENT system, which shows that Defendant Kwiat Eye collected $1,359,445.06 for services Plaintiff performed in 2017.  *See id.* at ¶ 4.  Ms. Kwiat then indicated that the total from the MEDENT system did not account for the cost of drugs and medications that Plaintiff used to perform her services, and the amounts that Defendant Kwiat Eye received for those drugs in reimbursements.  *See id.*  Ms. Kwiat then indicated that, according to the MEDENT report, the total cost of the drugs and medications that Plaintiff administered in 2017 was $748,190.76, and Defendant Kwiat Eye was reimbursed for $561,489.15 for those drugs.  *See id.*  Ms. Kwiat affirmed that the reimbursement for the drugs must be subtracted from the total of approximately $1.3 million that the MEDENT report indicated Plaintiff collected.  *See id.*  She did not explain why such adjustment was necessary.  Nevertheless, after adjusting for the reimbursement for the drugs Plaintiff administered, Ms. Kwiat found that Defendant Kwiat Eye collected $797,955.91 in fees for the services Plaintiff performed in 2017.[8]  *See id.*

---

[8] $1,359,445.06 in total collected fees subtracted by $561,489.15 in drug reimbursements equals $797,955.91.

Plaintiff challenges Ms. Kwiat's deduction of the reimbursed drugs from the total collected. *See* Dkt. No. 61 at ¶ 26. According to Plaintiff, "[t]he cost of the drugs [she] used in [her] employment with Defendants in 2017 ($748,190.76[ ]) would have necessarily been offset by the amount that was ultimately reimbursed ($561,489.15). Therefore, the amount Defendants were reimbursed would cover any difference between the amounts [she] billed and the amounts that were ultimately collected[.]" *See id.* Plaintiff thus argues that it appears that Defendants violated the Agreement by "improperly calculating [her] numbers to evade paying [her] the incentive compensation [she] rightfully earned." *See id.*

Ms. Kwiat further noted that, according to the MEDENT report, Defendant Kwiat Eye *billed* $2,212,600.46 for services Plaintiff performed in 2017. *See* Dkt. No. 53-40 at ¶ 4. Plaintiff also challenges that number, pointing to Ms. Kwiat's October 5, 2017 email – when she inadvertently sent Plaintiff the total amount of charges she billed each month – and noted that, in the first quarter of 2017 she billed $627,726.67, in the second quarter of 2016 she billed $653,886.17, and in the third quarter she billed $683,771.83. *See* Dkt. No. 53-41 at 2; Dkt. No. 61 at ¶ 25. According to Plaintiff, if the total she billed for 2017 was $2,212,600.46, then she must have only billed $247,215.79 for the fourth quarter of 2017, yet Defendants do not offer any reason why her fourth quarter numbers were so much lower. *See* Dkt. No. 61 at ¶ 25. Plaintiff affirmed that there were no significant changes to the number of patients she saw or the types of services she provided in the fourth quarter of 2017 as compared to the rest of 2017; and, therefore, she did not find the total bill accurate. *See id.* The Court also notes that it is curious that, according to these figures, Plaintiff would have billed $247,215.79 for her services for the fourth quarter of 2017, yet Defendant Kwiat Eye also reported that it actually collected $268,436.05 for her services during that quarter.

- 35 -

Lastly, Ms. Kwiat stated that the final amounts reflected in the MEDENT system were *lower* than the amounts reflected in her November 11, 2017, email "because the fees collected by [Defendant] Kwiat Eye are subject to further adjustment at the end of each year." *See* Dkt. No. 53-40 at ¶ 4.  Ms. Kwiat does not identify why the fees are subject to further adjustment or what that adjustment is other than that drug reimbursement costs are subtracted from the total collected fees.  Ms. Kwiat does not even explain why subtracting the drug reimbursement costs from the total collected costs is necessary or if it is Defendants' standard practice.  Defendants did not attach documents that would support and explain their position, such as showing Plaintiff's bills for services for patients and the amounts collected over a one-month period as compared to Dr. Kwiat's billing.  Additionally, if the Court were to assume – because it does not have enough information to discern – that the fees in Ms. Kwiat's November 11, 2017, email were not adjusted based on the drug reimbursements, then the MEDENT report's unadjusted estimate of $1,359,445.06 is significantly *higher* than the unadjusted rate of $803,66327 in the November 11, 2017, email.  As there is a clear discrepancy between these figures, and among other figures Defendants allege that they billed or collected for Plaintiff's services, and no clear explanation as to the various fees and adjustments that Defendants made to reduce Plaintiff's total collected amount, and Plaintiff questions and denies the accuracy of the fees based on the number of patients she saw and services she performed, the Court finds that there is a question of fact as to whether Plaintiff is entitled to incentive compensation for 2017 as promised in the Agreement.  As such, the Court denies Defendants' motion for summary judgment with respect to this claim.

### III. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 53, is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **DENIED** insofar as Plaintiff alleges a cause of action for breach of contract based on her entitlement to incentive compensation in 2017; and the Court further

**ORDERS** that Defendants' motion for summary judgment is otherwise **GRANTED**; and the Court further

**ORDERS** that the trial of this action shall commence at **10:00 a.m. on August 28, 2023**, in Albany, New York.  The Court will issue a separate Final Pretrial Scheduling Order, setting forth the deadlines for filing pretrial submissions, including motions *in limine*, at a later date.

**IT IS SO ORDERED.**

Dated:  January 24, 2023
      Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Judge